McMILLAN MORTGAGE CO., A CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 83811. Filed August 31, 1961.

*Maynard Garrison, Esq.,* and *Richard P. Norton, Esq.,* for the petitioner.
*David R. Brennan, Esq.,* for the respondent.

MULRONEY, *Judge:* The respondent determined deficiencies in petitioner's corporate income tax for its fiscal years ended May 31, 1956, 1957, and 1958 of $13,454.03, $115,504.22, and $54,503.89, respectively. Petitioner is engaged in the mortgage loan business. During the years in question it sold some mortgages to the Federal National Mortgage Association, and, pursuant to the Association's requirements, it received, as the proceeds of the sales, cash and shares of Federal National Mortgage Association stock. The principal issue is whether said shares of stock were a capital asset in the hands of petitioner.

FINDINGS OF FACT.

Some of the facts have been stipulated and they are found accordingly.

Petitioner, McMillan Mortgage Co., is a California corporation having its principal place of business in Los Angeles. It filed its income tax returns on the accrual basis with the district director of internal revenue at Los Angeles for its fiscal years ended May 31, 1956, 1957, and 1958.

During the years in question petitioner was engaged in the business of originating and developing first mortgage loans on residential properties, selling them to permanent investors, and servicing the loans for the account of the investors during the life of the loans. The major portion of its income was derived from fees for its servicing activities, consisting of making the monthly collections due under the mortgages and remitting to the investors monthly. As an incident of its business petitioner sold mortgages and deeds of trust which it had originated or acquired to the Federal National Mortgage Association (hereafter sometimes called FNMA). Petitioner treated FNMA as a secondary market for its loans. When possible it sold to private investors because a higher price could normally be obtained. When the private money market was tight it would sell to FNMA. It performed servicing activities on mortgages sold to FNMA.

Pursuant to the requirements of the Federal National Mortgage Association Charter Act [1] and under the provisions of standard contracts with FNMA, petitioner was required to pay to FNMA a purchase and marketing fee and to subscribe to the capital stock of FNMA. The amount of the stock subscription required of the petitioner on each sale of a mortgage [2] for the period before September 19, 1956, was 3 percent of the outstanding principal balance of the mortgage at the date of sale and after September 18, 1956, was usually 2 percent of such balance.

When mortgages were sold to FNMA petitioner received the agreed purchase price in cash, less the purchase and marketing fee and less an amount equivalent to the par value of the stock covered by the subscription. For the subscription petitioner received shares of common stock in FNMA computed at the par value of $100 per share. During the years in question the FNMA stock to which petitioner subscribed as a result of the sale of mortgages to FNMA was accumulated by FNMA and delivered to petitioner in the month following the month of sale. The cash payment from FNMA was made currently. Petitioner accrued and entered in its books the number of shares of such stock receivable by it at the end of a calendar month for transactions completed during said calendar month.

The total number of mortgage loans and total principal amount thereof sold by petitioner during the years in question and the portion of such totals sold to the FNMA are as follows:

[1] The Federal National Mortgage Association Charter Act (approved August 2, 1954) appears as Title III of the Housing Act of 1954 (68 Stat. 612) at 12 U.S.C., sec. 1716, *et seq.* The statute has been amended several times since its passage. The amendments are not pertinent here. For convenience of citation, reference herein will be to the statute as it appears in 12 U.S.C., sec. 1716, *et seq.* (1958 ed.).

[2] Where used herein the term mortgage shall also be considered to include a deed of trust.

| Year ended May 31— | Dollar volume | | Number of loans | |
|---|---|---|---|---|
| | FNMA | Total | FNMA | Total |
| 1956 | $2, 429, 368. 24 | $42, 342, 159. 76 | 216 | 3, 751 |
| 1957 | 20, 289, 595. 49 | 36, 301, 122. 12 | 1, 873 | 3, 199 |
| 1958 | 8, 160, 114. 74 | 18, 897, 199. 77 | 707 | 1, 481 |

During the years in question FNMA stock was received and disposed of by petitioner in amounts as follows:

| Year ending May 31— | Received | Disposed of | Number of dispositions |
|---|---|---|---|
| | Shares | | |
| 1956 | 571 | 561 | 3 |
| 1957 | 4, 541 | 3, 697 | 26 |
| 1958 | 1, 952 | 2, 584 | 19 |
| Total | 7, 064 | 6, 842 | 48 |

At all times during the years in question there was a market for FNMA stock and at all times the market value of said shares was less than its par value and fluctuated in the neighborhood of $50 per share.

During its fiscal year ended May 31, 1956, petitioner kept its records and computed its profit or loss on sales of its mortgages to FNMA by including in its proceeds from said sales an amount equivalent to the par value of the stock. The shares were recorded in an account called "FNMA Stock Inventory Account" and, upon actual sale of said stock by petitioner, the loss representing the difference between the par value and the proceeds from sale was recorded in an account headed "Operating loss—FNMA Stock."

During its fiscal years 1957 and 1958 petitioner kept its records and computed its profit or loss on sales of mortgages to FNMA by including in its proceeds from such sales an amount equivalent to the estimated fair market value of the FNMA stock (estimated at all times during the years in question to be 50 percent of the par value of such stock). These shares were recorded in the inventory account described above. Upon the sale of these shares the gain or loss representing the difference between the estimated fair market value recorded at the date of acquisition and the proceeds from the sales was recorded in the FNMA stock loss account.

During the years in question the value as shown on the books of the FNMA stock on hand at the end of each fiscal year was adjusted to reflect the then market price of the shares. The amount of the adjustment was debited or credited to the FNMA stock loss account. This entry was then reversed at the beginning of the succeeding fiscal year.

A large number of shares of FNMA stock were sold or otherwise disposed of within about 60 days after their receipt. In general, all shares received were sold or otherwise disposed of in less than 6 months after their receipt.

During the years in question petitioner did not treat the FNMA shares in its books or records as investments or as capital assets. On the contrary, it carried them as a current asset on its financial statements. Any gain or loss in the sale of said stock was treated by petitioner on its books as ordinary gain or loss.

On its income tax returns for fiscal 1956, 1957, and 1958 in reporting its income petitioner treated the gain or loss on its FNMA stock as described above as a part of its gain or loss from operations. In the statutory notice respondent determined that petitioner's income should be increased in each of the years in question. Respondent explained the adjustment to petitioner's 1956 income as follows:

> It is determined that the amounts which you paid for the purchase of stock of the Federal National Mortgage Association does not constitute inventory items but, instead, constitutes the purchase of capital assets and should be capitalized. The basis of such stock is its cost to you of $100 per share, irrespective of its fair market value, and gain or loss upon subsequent disposition of such stock constitutes a capital gain or loss, and not a deductible business expense. Inasmuch as you had no capital gains in the year ended May 31, 1956, no deductions for capital losses are allowable * * *.
>
> *Loss Disallowed*_____ ($25,873.14) * * *.
>
> *     *     *     *     *     *     *
>
> It is determined that your action in writing off as an expense an alleged reduction in your cost of ten shares of Federal National Mortgage Association stock held by you at the end of your fiscal year ended May 31, 1956, was erroneous for the reason that such ten shares of stock, having an original cost basis to you of $1,000, were capital assets and not inventory items, and as to these ten shares of stock there was no closed transaction in this fiscal year.

Respondent explained the adjustment to petitioner's 1957 income as follows:

> It is determined that the full amount received by you from the sale of mortgages and related notes to the Federal National Mortgage Association should be included in income in the year of sale without any reduction by reason of the purchase of stock in the Federal National Mortgage Association. Income to you on the sale of mortgages and related notes to the Federal National Mortgage Association consists of the net amount of cash received from such association in the case of each sale plus the amount of cash used by you in the purchase of stock in such association in the case of each sale. Since you have erroneously failed to include in income the full amount of cash used by you in the purchase of stock in the Federal National Mortgage Association in the case of each sale, your income has been increased [accordingly]. It is further determined that the amounts which you paid for the purchase of stock of the Federal National Mortgage Association does not constitute inventory items but, instead, constitutes the purchase of capital assets and should be capitalized. The basis of such stock is its cost to you of $100 per share plus cost of purchase, if any, irrespective of its fair market value, and gain or loss

upon subsequent disposition of such stock constitutes a capital gain or loss and not a deductible business expense. * * *

| | |
|---|---|
| Additional income used to purchase 4540 shares of FNMA stock during the year at $100 per share plus expenses | $227, 035. 03 |
| Sale of FNMA stock reversed | (531. 32) |
| Loss on sale of FNMA stock reversed | 724. 13 |
| Reversal of an alleged increase in the fair market value of FNMA stock | (5, 480. 00)* |

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

*It is determined that your action in crediting expense with an alleged increase in the fair market value of stock held by you in the Federal National Mortgage Association in the fiscal year 1957 was erroneous for the reason that such stock was capital assets and not inventory items, and as to this stock there was no closed transaction in this fiscal year.

Respondent's explanation of deficiency for the year 1958 is similar to that of 1957. Respondent also disallowed as an expense amounts petitioner expended for stamp taxes incident to the sale of FNMA stock.

### OPINION.

The Federal National Mortgage Association Charter Act, rechartered the FNMA as an agency, the purpose of which was to provide, among other things:

supplementary assistance to the secondary market for home mortgages by providing a degree of liquidity for mortgage investments, thereby improving the distribution of investment capital available for home mortgage financing; [3]

The Act obviously is not a revenue statute. Neither the language of the statute itself nor its legislative history contain any indication as to how mortgage companies dealing with FNMA must treat or hold the stock for Federal tax purposes. It provides that the FNMA shall purchase insured residential or home mortgages at a price fixed on the basis of the unpaid principal amount of the mortgage at the time of purchase. 12 U.S.C., sec. 1717(b).[4] It further provides that FNMA shall accumulate surplus from private sources by requiring mortgage sellers to make "nonrefundable capital contributions" of a percentage of the unpaid principal balance of the mortgage. 12 U.S.C., sec. 1718(b).[5] In return, the mortgage seller shall receive

---

[3] 12 U.S.C., sec. 1716(a).

[4] 12 U.S.C., sec. 1717(b) provides, in part:

(b) For the purposes set forth in section 1716 of this title and subject to the limitations and restrictions of this subchapter, the Association is authorized to make commitments to purchase and to purchase, service, or sell, any residential or home mortgages (or participations therein) which are insured under this chapter, as amended, * * * : *Provided,* That (1) no mortgage may be purchased at a price exceeding 100 per centum of the unpaid principal amount thereof at the time of purchase, with adjustments for interest and any comparable items; * * *

[5] 12 U.S.C., sec. 1718(b) provides, in part:

(b) The Association shall accumulate funds for its capital surplus account from private sources by requiring each mortgage seller to make payments of nonrefundable capital contributions, equal to not more than 2 per centum nor less than 1 per centum of the unpaid principal amounts of mortgages purchased or to be purchased by the Association from such seller * * *

FNMA $100-par-value common stock. 12 U.S.C., sec. 1718(c).[6]

The sample contract in evidence between petitioner and FNMA provides, in part:[7]

The purchase price shall be an amount equal to 93½ percent of the outstanding principal balance of the mortgage * * *.

\* \* \* \* \* \* \*

The Seller shall pay to the Purchaser at the time of disbursement, and hereby authorizes the Purchaser at that time to deduct from the amount to be disbursed by reason of the payment of the purchase price, the following:

(a) A purchase and marketing fee in the amount of 1 percent of the outstanding principal balance of the mortgage * * *,

(b) A subscription to the capital stock of the Purchaser in the amount of 2% of the outstanding principal balance of the mortgage * * *

What petitioner received in every case (using the figures in the contract above as an example) was an immediate disbursement of cash to the extent of 90½ percent of the outstanding balance of the mortgage sold and an immediate right to receive 2 percent of the outstanding balance of the mortgage in FNMA stock measured by its par value. The contract was not severable. Petitioner could not have declined to take stock and receive cash instead. At no time did petitioner have claim to cash in the amount of 93½ percent of the outstanding balance of the mortgage. Nor did it have a claim to cash plus property totaling 93½ percent of such balance. Its right under the contract was to receive cash of 90½ percent of the mortgage balance plus property valued for purposes of the transaction between the parties at $100 but salable at an ascertainable market figure in the neighborhood of $50 per share.

The record shows that there was at all times an actual market for the FNMA stock. Petitioner's president testified that while the market fluctuated from about 38 to about 60, "the average has been pretty close to 50 cents on the dollar all during the years." The parties have stipulated that "at all times the market value of said shares was less than its par value and fluctuated in the neighborhood of $50.00 per share."

Petitioner never purchased any FNMA stock on the open market. It acquired no FNMA stock other than as a part of mortgage sales to FNMA.

In 1958 respondent ruled:[8]

The legislative history of the Federal National Mortgage Association Charter Act of 1954 indicates the Congress intended that purchases of stock of the Association are to be treated as investments in the Association. * * *

\* \* \* \* \* \* \*

---

[6] 12 U.S.C., sec. 1718(c) provides, in part:

(c) The Association shall issue, from time to time, to each mortgage seller its common stock (only in denominations of $100 or multiples thereof) evidencing any capital contributions made by such seller pursuant to subsection (b) of this section. * * *

[7] The contract in evidence has been filled in with the percentages which appear here. It is dated May 1957.

[8] Rev. Rul. 58–41, 1958–1 C.B. 86.

· * * * it is held that (1) the payment for the stock must be capitalized and, since the stock is not an inventory item or an item held for sale to customers in the ordinary course of business, may not be valued at the lower of cost or market but must be valued at cost; (2) such stock constitutes a capital asset * * * and any gain or loss upon its subsequent disposition constitutes a capital gain or loss * * *

Respondent's position is that petitioner paid a portion of the proceeds it received from mortgage sales to FNMA to buy the latter's stock at par and that expenditures for the cost of such stock are not deductible under section 162, I.R.C. 1954, as ordinary and necessary business expenses because the stock was acquired and held as a capital asset. If respondent is correct in his position, then as his deficiency notice states, subsequent sales of stock would result in capital gains or losses.

Petitioner disputes respondent's contention that it received the agreed purchase price on mortgage sales to FNMA and then turned back to FNMA a portion of such sum to buy stock at par. This dispute is of no consequence. It complied with FNMA's required procedure with respect to such sales. Whether that procedure be viewed as requiring a seller to accept some cash and the balance in stock at par, for the agreed selling price, or accept all cash and buy stock at par, is immaterial. In either event the seller would be deemed to have made an "expenditure" in the same amount for stock. In short, whether petitioner made a required expenditure in the sense of a cash disbursement for the stock, or whether it submitted to a required deduction from the purchase price of its mortgages, the result would be the same if the stock acquired in either manner were a capital asset.

Petitioner's position is that under the particular facts of its business the FNMA stock it acquired was not a capital asset and therefore the expenditure for its acquisition was a deductible business expense under section 162, I.R.C. 1954, and the gains or losses on its subsequent sale were ordinary gains or losses. Without detailing the system by which petitioner recorded its stock transactions and reported its income during all of the years involved, it is enough to state that petitioner treated such transactions as a part of its business and not as the acquisition and sale of capital assets. Respondent makes no argument that any deficiency would result if it be held the stock was not acquired, held, and sold as a capital asset.

Respondent's argument on brief is that the stock held by petitioner "was a capital asset since it did not fall within any of the exclusions from the definition of capital asset contained in section 1221 of the 1954 Code." Petitioner's argument is, in effect, that the full scope of its mortgage business as herein shown embraced its acquisition and subsequent sale of FNMA stock and, therefore, the stock in its hands

was within the first exclusion from the definition of a capital asset contained in section 1221(1) of the Internal Revenue Code of 1954:

SEC. 1221. CAPITAL ASSET DEFINED.

For the purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

We feel petitioner is correct. Petitioner's business activity starts with developing loans that are commonly called in the trade VA and FHA loans. This means it loaned its money on first mortgage loans on residential properties and the loans were such that they were approved by the Veterans' Administration and Federal Housing Authority. Its next business activity was to sell these loans to permanent investors and secure contracts to service the loans during the life of each loan. It derived the major portion of its income from payments for its servicing activities. Once the loan was made, it was held for sale so that cash could be realized thereon and new loans developed. Petitioner was not a permanent investor in mortgage loans seeking interest income. It sought profits from mortgage sales and service fee income and it had to sell its mortgages in order to realize such income.

In its business activity of marketing its mortgages it first turned to the private investor's market whenever there were available funds in that market for petitioner's type of investment. When, in the words of petitioner's president, "the money market becomes tight" petitioner turned to the secondary market or FNMA, which was provided by the Government for just this purpose. The FNMA transactions were entered into in the ordinary course of petitioner's business of marketing its mortgages. As an integral and essential part of dealing with FNMA, petitioner was required to take part of the proceeds of sale in FNMA stock at par value. It held the stock for relatively short periods of time. Indeed, it would have been unreasonable for it to have kept funds tied up in the stock when presumably it was the need for liquidity which compelled the sale to FNMA under less favorable terms than in the primary market.

As the findings of fact show, petitioner's sales of its mortgages to FNMA were substantial. They were a part of the normal operation of petitioner's business. Since each sale of a mortgage to FNMA involved petitioner acquiring FNMA stock, the acquisition of this stock and its sale was a normal business activity incident to petitioner's business.

Petitioner's business activity of acquiring and selling FNMA stock was a necessary adjunct to its mortgage business not unlike the situa-

tion of a franchise automobile dealer who is in the used car business in acquiring and selling trade-ins. Petitioner acquired and sold the stock as a normal day-to-day business activity of its mortgage business and the stock was not a capital asset in its hands.

It is true, as respondent states, that expenditures for capital assets are not deductible business expenses, and such property as stock is generally treated as a capital asset. However, there is substantial authority that such property is not a capital asset when the particular facts of the taxpayer's business show that expenditures for its acquisition are proper and necessary in the furtherance of such business and the securities were not acquired for investment purposes.

In *Western Wine & Liquor Co.*, 18 T.C. 1090, the taxpayer was a wholesale liquor dealer. At a time when liquor was in short supply he bought stock in a distilling corporation in order to gain a right to buy a portion of its whisky inventory. We held the stock was not a capital asset.

In *Bagley & Sewall Co.*, 20 T.C. 983, affd. 221 F. 2d 944, the taxpayer, a manufacturing concern, purchased bonds to be placed in escrow, guaranteeing the faithful performance of its contract, and upon escrow release sold the bonds at less than cost. We held the loss was an ordinary loss and not a capital loss as respondent contended and that under the facts, the purchase, retention, and sale of the bonds were an integral part of the taxpayer's business.

In *Harry Dunitz*, 7 T.C. 672, affd. 167 F. 2d 223, taxpayers purchased and sold their own bonds. We held that the bonds were not capital assets in the hands of taxpayers because the purchase and sale of such bonds were activities inherently necessary to their business of managing the property which secured the bonds and, therefore, taxpayer's gain on disposition of the bonds was ordinary income.

In *Tulane Hardwood Lumber Co.*, 24 T.C. 1146, taxpayer was a lumber and plywood wholesaler. It bought the debentures of a plywood manufacturer in order to insure it a source of plywood and sold them later at a loss when the reason for holding them had disappeared. Respondent treated the loss as a loss sustained from the sale of a capital asset. In holding the loss was an ordinary loss, we said:

Petitioner's action in purchasing the debenture was a reasonable and necessary act in the conduct of its business. The loss of the purchase price was proximately related to that acquisition. Hence under section 23 the amount was a deductible business expense, or business loss * * *

To the same effect as the above authorities are *Smith & Welton, Inc.* v. *United States*, 164 F. Supp. 605, and *Electrical Fittings Corporation*, 33 T.C. 1026.

In *Schumacher Mortgage Co., Inc.* v. *United States* (W.D. Tenn.), an unreported opinion decided May 27, 1960,[9] the exact question involved here was presented. There the court concluded that the FNMA stock acquired by the mortgage banker under identical circumstances was not a capital asset. Respondent's only argument with respect to this case is that it is wrong.

We hold under the record presented, contrary to Rev. Rul. 58–41, 1958–1 C.B. 86, that the stock was not a capital asset and petitioner's expenditures (whether considered to be expenditures of cash or expenditures of part of the agreed sale price of mortgages) were necessary expenditures of the business and hence the amount was a deductible item.

In 1960 Congress amended section 162 of the Internal Revenue Code of 1954, which is the section allowing deductions for trade or business expenses, by adding thereto subsection (d), which provides:

(d) CAPITAL CONTRIBUTIONS TO FEDERAL NATIONAL MORTGAGE ASSOCIATION.— For purposes of this subtitle, whenever the amount of capital contributions evidenced by a share of stock issued pursuant to section 303(c) of the Federal National Mortgage Association Charter Act (12 U.S.C., sec. 1718) exceeds the fair market value of the stock as of the issue date of such stock, the initial holder of the stock shall treat the excess as ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business.

At the same time Congress amended section 1054 of the Internal Revenue Code of 1954 to provide, as follows:

In the case of a share of stock issued pursuant to section 303(c) of the Federal National Mortgage Association Charter Act (12 U.S.C., sec. 1718), the basis of such share in the hands of the initial holder shall be an amount equal to the capital contributions evidenced by such share reduced by the amount (if any) required by section 162(d) to be treated (with respect to such share) as ordinary and necessary expenses paid or incurred in carrying on a trade or business.

It is obvious from the Committee reports,[10] (portions of which we have set forth in a footnote) that at the time the above amendments

---

[9] 5 A.F.T.R. 2d 1738, 60–2 U.S.T.C. par. 9524.

[10] The 1954 act rechartering the Association provided, however, that the Association was to accumulate capital funds by requiring each mortgage seller to make payments of specified amounts of nonrefundable capital contributions to the Association in exchange for capital stock of the Association. Currently, the amount to be paid by a taxpayer-subscriber must equal 2 percent of the unpaid principal of the mortgages he is selling to the Association and for this the Association issues stock on the first day of the succeeding month.

Problems have arisen as to the tax treatment provided for this stock which must be purchased by a taxpayer when he sells mortgage paper to FNMA. The problems have arisen because, although there is a market for the FNMA stock, the market price is appreciably below the stock issuance price, currently the market price being around 55 percent of the issuance price.

Taxpayer-subscribers generally have assumed that any excess of the issuance price over the market price of this stock represented an ordinary and necessary expense incurred in carrying on their trade or business since they acquired the stock in order to sell their excess supply of mortgage paper. In 1958, however, the Internal Revenue Service ruled (Rev. Rul. 58–41, 1958–1 CB 86) that no part of the purchase price of stock of FNMA

were passed, Congress wished to change the tax consequences set forth in Rev. Rul. 58-41, 1958-1 C.B. 86, previously quoted.

We need not draw any conclusions from these amendments, i.e., whether Congress intended to clarify the existing law and overrule Rev. Rul. 58-41 as petitioner suggests, or that the law was otherwise before the amendments, as respondent suggests. However, respondent makes an argument to the effect that a decision for petitioner here will result in a double deduction for petitioner and those in the same business for the taxable years after December 31, 1959.

Respondent points out section 1001, I.R.C. 1954, has not been amended. It provides:

> The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. [Sec. 1001(b).]

This would mean, according to the statements in respondent's brief, that a mortgage seller to FNMA would report the cash and fair market value (around 50 percent) of the stock as the amount realized upon the sale of a mortgage. Then under the amendment, sec. 162(d), the seller is given a specific business expense deduction in the precise amount of the excess by which the capital contribution evidenced by the shares of stock exceeds the fair market value on the date of issuance (again around 50 percent).

We do not have any taxable years after December 31, 1959, before us and we deem this argument speculative and inappropriate and we refrain from expressing any views as to the correctness of respondent's forecast of the result of the application of the amendments in the years when they take effect.

Also in issue are amounts which were expended for stamp tax purchases incident to the sale of the FNMA stock. Respondent contends that they are a part of the capital expenditure for such stock. In accord with our holding above, the amounts qualify as an expense.

*Decision will be entered under Rule 50.*

---

constituted a deductible business expense. Instead, it was held that the entire amount paid for the stock must be capitalized and treated as the cost of the stock so acquired. Thus, this ruling holds that there is no tax effect at the time of the purchase or issuance of the stock even though the market price of the stock then is substantially below the issuance price. Instead, the tax effect occurs only when the stock is sold by the taxpayer.

Your committee believes that it is unfortunate to require the capitalization of these expenditures for FNMA stock by taxpayer-subscribers to the extent they represent the excess of purchase price over market price. Viewed from such a taxpayer's standpoint, the excess appears clearly to be expenditures which he must incur in order to sell the mortgage paper he holds. In view of this, your committee believes that such amounts should be treated as ordinary and necessary expenses incurred in carrying on a trade or business. This, of course, means that in the transaction which occurs when the stock is sold (usually a capital transaction) the basis of the stock should not include this amount previously taken as a deduction. [H. Rept. No. 1662 to accompany H.R. 7885, 86th Cong., 2d Sess.]

The House Committee Report, *supra,* also states:

In making this statutory amendment, however, your committee intends no inferences to be drawn as to the tax treatment accorded FNMA stock before the enactment of this provision.